Leon D. Lazer, J.
In this State, persons who lack a legal or equitable interest in real property have never been granted standing to attack a zoning ordinance. Alleging that their constitutional and statutory rights are being violated by exclusionary zoning practices of the Town of Brookhaven, a number of such unpropertied individuals plus a few taxpayers and *81 certain organizations have instituted the instant action for judgment declaring the nullity of the zoning ordinance of the town and for extensive ancillary relief. The defendants have moved to dismiss the complaint on the ground that it does not state a cause of action and that the plaintiffs lack the legal capacity to bring the suit.
THE PARTIES
The plaintiffs are comprised of four categories of individuals and three organizations. The individual plaintiffs are low-income residents of Brookhaven, both black and white, who live in overcrowded or otherwise inadequate rented quarters; homeowning Brookhaven taxpayers, both black and white, who allege that the defendants’ exclusionary zoning practices deprive them of the opportunity of living in a racially and economically balanced community; a white graduate student and his wife and a black graduate student at the Stony Brook campus of the State University who allege that they cannot find adequate housing which is within their economic means; a nonresident black woman who was forced to leave Brookhaven because she could not locate adequate housing for herself and her two children and who now lives on public assistance with them in inadequate housing in Riverhead; and the president of the Borough of Manhattan who claims to represent minority citizens living in the city’s "slum ghetto” who cannot relocate in Brookhaven because affordable housing is unavailable. The organizations are Suffolk Housing Services, a nonprofit agency established to assist low-income and minority citizens to obtain decent housing in Suffolk County; the Brook-haven Housing Coalition, an association of religious and community organizations which have joined together to work for a racially and economically integrated community; and the Patchogue-Brookhaven Branch of the National Association for the Advancement of Colored People which seeks solutions for the lack of adequate housing for low-income and minority citizens in the Town of Brookhaven. Each of these organizations avers that its clients or members are directly injured and aggrieved by the defendants’ zoning practices. The plaintiffs sue individually and on behalf of all others similarly situated.
The defendants are the Town of Brookhaven, its supervisor, its planning board, and the chairman of the planning board.
*82 THE COMPLAINT
The plaintiffs plead, inter alia, that despite Brookhaven’s population increase of 123% during the decade 1960-1970 its black population was reduced from 3.4% to 2.6% and that 97% of the growth was white; that most of the minority population lives in racial enclaves of deteriorating housing located in North Bellport, Gordon Heights, Patchogue and Center Moriches; that it is town policy to exclude multifamily development as of right and most of the 60,300 acres of vacant privately owned land is currently zoned for single-family development; that an excessive amount of vacant land is zoned for commercial and industrial uses; that where multifamily housing has been permitted, the town has imposed covenants or obtained the agreement of the developer to limit the number of bedrooms; and that the zoning ordinance requires an additional 1,000 square feet per bedroom where more than one bedroom is proposed in the MF-1 zoning district and an additional 1,000 square feet of site for each additional bedroom in the MF-2 district. All of these restrictions on multifamily development are alleged to have a disproportionately harsh impact on low-income persons — and particularly minority groups — who must rent rather than purchase. The town has no housing authority, it has refused to support privately sponsored federally subsidized housing, and it has refused to apply for Federal grants for community development. According to plaintiffs, these policies preclude town residents and others in the metropolitan area from obtaining decent housing in the community.
In their first cause of action plaintiffs maintain that the zoning policies described violate the requirement in section 261 of the Town Law that zoning be in furtherance of the general welfare; in the second cause of action that it deprives plaintiffs of equal protection of the law as secured by section 11 of article I of the New York State Constitution; in the third that it violates the requirement of section 272-a of the Town Law that zoning be in accordance with a master plan designed to promote the general welfare; and in the fourth that it constitutes a violation of the Thirteenth and Fourteenth Amendments to the Federal Constitution and of sections 1981, 1982, 1983 and 3601 et seq. of title 42 of the United States Code. The plaintiffs seek a declaration of the invalidity of the zoning ordinance and "land use mapping” policies of the town, further relief enjoining the defendants from pursuing policies *83 and practices which deny decent and equal housing opportunities to plaintiffs and those they represent and judgment directing the defendants to take various affirmative steps to alleviate current deficiencies so as to provide them with the housing opportunities they seek.
THE MOTION TO DISMISS FOR FAILURE TO STATE A CAUSE OF ACTION
On a motion to dismiss for failure to state a cause of action, all of the allegations of the complaint are deemed to be true (Rainbow Shop Patchogue Corp. v Roosevelt Nassau Operating Corp., 34 AD2d 667), and, together with all reasonable inferences, must be viewed in a light most favorable to plaintiffs. The concern is not whether plaintiffs can prove a cause of action but whether they have alleged one (Sanchez v Village of Liberty, 49 AD2d 507). If any one of plaintiffs’ four causes of action can be sustained as a matter of pleading, the instant motion must be denied in its entirety since it is addressed to the complaint as a whole (Matter of Smith v Lavine, 44 AD2d 570).
Exclusionary zoning has been defined as land use control regulations which singly or in concert tend to exclude persons of low or moderate income from the zoning municipality (2 Anderson, American Law of Zoning [2d ed], § 8.02). As early as 1924 the exclusionary impact of comprehensive zoning was recognized at the Federal District Court level when in the course of nullifying the zoning ordinance of the Village of Euclid, Ohio, Judge Westenhaver observed that "[I]n the last analysis, the result to be accomplished [by zoning] is to classify the population and segregate them according to their income or station in life.” (Ambler Realty Co. v Village of Euclid, 297 F 307, 316).
The Euclid ordinance had been attacked because it excluded, inter alia, business uses and apartment houses from a residential district. When the case reached the Supreme Court the ordinance was sustained (see Euclid v Ambler Co., 272 US 365) on the theory that it served the general welfare of the public because it tended to improve fire protection, reduce street congestion, decrease noise which produces or intensifies nervous disorders, and preserve a more favorable environment for the raising of children. Euclid was the first action involving comprehensive zoning regulations ever to reach the Supreme Court and, in the decades which followed, the court’s *84 rationale in the case has been the seminal source of jurisprudential authority for the approval of zoning regulations which have an exclusionary effect of one type or another.
In New York, minimum lot area restrictions (Levitt v Incorporated Vil. of Sands Point, 6 NY2d 269), restrictions on apartment buildings in residential districts (Matter of Wulfsohn v Burden, 241 NY 288, 301; Matter of Fox Meadow Estates v Culley, 233 App Div 250, affd 261 NY 506), and even aesthetic considerations (see People v Stover, 12 NY2d 462; Chusud Realty Corp. v Village of Kensington, 40 Misc 2d 259, affd 22 AD2d 895) have been upheld as reasonably related to the public welfare where they do not impose too great a hardship on the individual property owners. Traditionally, litigation contesting the validity of zoning regulations has involved competition between the general welfare concept— characterized by the perception of certain types of exclusionary restrictions as beneficial — and the rights of landowners to obtain a reasonable return on their property (see Matter of National Merritt v Weist, 41 NY2d 438) or to prevent its devaluation as a consequence of spot zoning to enhance the value of the property of others (Buckley v Fasbender, 1 NY2d 681). Within this narrow framework, the right of individuals to obtain adequate affordable housing in any particular community remained unrecognized until the relatively recent past.
The defendants concede that exclusion is at the core of comprehensive zoning, but they deny that plaintiffs’ housing difficulties are its consequence. Plaintiffs’ problems, they contend, result from their economic plight and not municipal zoning restrictions. In defendants’ view, zoning regulations beneficial to the Brookhaven majority should not be annulled because of the financial exigencies of a comparative few. Undoubtedly, Euclidian zoning has served as a significant device in the molding of suburban communities satisfactory to the great majority of residents. However, the ongoing deterioration of the inner cities and the concomitant population and industrial flight have intensified the exclusionary effect of zoning restrictions upon members of the lower economic strata and racial minorities (see Symposium, Exclusionary Zoning, 22 Syracuse L Rev 465; 2 Anderson, American Law of Zoning [2d ed], § 8.01). Pressure for relaxation of such restrictions and challenges to their validity have inevitably followed.
In this republic, invidious legal classifications ultimately *85 yield, even at some pain to the established social order (see, e.g., Brown v Board of Educ., 347 US 483, opn supplemented 349 US 294, [segregated public education]; Shapiro v Thompson, 394 US 618 [welfare residency requirement]; Baker v Carr, 369 US 186 [unequal representation]), but- if past is prologue no prescience is necessary to forecast that the process of eliminating the invidiously exclusionary aspects of Euclidian zoning will be a protracted one. At the Federal level the "intentional discrimination” standard enunciated by the United States Supreme Court in Arlington Heights v Metropolitan Housing Corp. (429 US 252) eliminates any pragmatic Federal judicial remedy at this time and the few States to consider the exclusion issue have been slow to move.
Although a large lot ordinance was struck down as exclusionary in the Virginia Supreme Court in 1959 (Board of County Supervisors of Fairfax County v Carper, 200 Va 653) and by the Pennsylvania Supreme Court in 1965 (National Land & Inv. Co. v Easttown Twp. Bd. of Adg., 419 Pa 504) and 1970 (Concord Twp. App., 439 Pa 466), invalidation of an exclusionary zoning ordinance aimed at preventing multifamily development did not occur until 1970 when the Supreme Court of Pennsylvania decided Girsh App. (437 Pa 237). A series of similar determinations in both Federal and State courts followed (see Southern Burlington County NAACP v Township of Mount Laurel, 67 NJ 151, cert den 423 US 808; Oakwood at Madison v Township of Madison, 72 NJ 481; United States v City of Black Jack, 508 F2d 1179, cert den 422 US 1042, reh den 423 US 884; Ybarra v City of Town of Los Altos Hills, 503 F2d 250). Nonetheless, apart from a strong dictum to the effect that it would not "countenance * * * under any guise * * * community efforts at immunization or exclusion” and some further discussion of regional housing problems in Matter of Golden v Planning Bd. of Town of Ramapo (30 NY2d 359, 378, app dsmd 409 US 1003), the Court of Appeals of this State rendered no determination relative to exclusionary zoning until its landmark decision in Berenson v Town of New Castle (38 NY 102) at the end of 1975.
Berenson involved an attack on the validity of the entire New Castle zoning ordinance because it excluded multifamily housing throughout the town. The case was traditionally postured with landowning plaintiffs who had failed to obtain approval for a multifamily condominium development— *86 clearly not intended for low or moderate income occupants— on a 50-acre site in a one-acre single-family zoning district. Cross motion for summary judgment was denied because Special Term and the Appellate Division found the existence of constitutional and fact issues as to whether the need for multifamily housing in New Castle " 'is so compelling as to amount to a deprivation of the constitutional rights of those people, who are presently, or would if economically feasible, become residents of the Town’ ” (38 NY2d 102, 106, supra).
Disagreeing with this formulation of constitutional issues and relying upon the general welfare provision of section 261 of the Town Law, the Court of Appeals enunciated a two-tiered doctrine under which the New Castle Town Board was held obligated: (1) to provide a properly balanced and well-ordered plan for the community which meets its present and future needs; and (2) to consider regional needs and requirements in view of the needs of Westchester County and New York metropolitan region residents who require multifamily housing in the New Castle area to be near their employment or for a variety of other social and economic reasons. The court stopped far short of the "fair share” doctrine posited by the New Jersey Supreme Court to the effect that each municipality must provide the opportunity to meet a fair share of regional requirements (Oakwood at Madison v Township of Madison, 72 NJ 481, supra; Southern Burlington County NAACP v Township of Mount Laurel, 67 NJ 151, supra) and declared instead that there is no municipal obligation to provide for local or regional needs if those needs already are being met by other nearby communities. As in Pennsylvania, where the plaintiffs also have been landowners and developers, the constitutional question of equal protection was avoided (see e.g., Girsh App., 437 Pa 237, supra; Concord Twp. App., 439 Pa 466, supra; National Land & Inv. Co. v Easttown Twp. Bd. of Adj., 419 Pa 504, supra) by the Court of Appeals.
When the instant complaint is tested against applicable law as stated in Berenson, plaintiffs adequately plead that the town’s zoning policies contravene the general welfare requirements of section 261 of the Town Law and (even if somewhat obtusely) that the town has not provided a properly balanced, well-ordered plan for the community which meets its present and future needs. Therefore, the first cause of action of the complaint is legally stated and the entire complaint survives (see Matter of Smith v Lavine, 44 AD2d 570, supra).
*87 THE ISSUE OF STANDING
The gravamen of the assault on plaintiffs’ standing to bring this action is the claim that they have failed to allege that the offending ordinance has caused any pecuniary damage to real property in which they have an interest or that they have any affiliation with a specific project prohibited by the ordinance which might otherwise serve to alleviate their housing difficulties. Under the traditional rule, only those who assert pecuniary or economic loss and who have a legal or equitable interest in land have standing to challenge a zoning restriction (see, e.g., Marcus v Village of Mamaroneck, 283 NY 325; Matter of Haber v Board of Estimate of City of N. Y., 33 AD2d 571; Matter of Manor Woods Assn. v Randol, 29 AD2d 778; Brechner v Incorporated Vil. of Lake Success, 25 Misc 2d 920, affd 14 AD2d 567, mot to dismiss app den, 11 NY2d 875, app dsmd 11 NY2d 929; cf. Matter of Douglaston Civic Assn. v Galvin, 36 NY2d 1). The rule was fashioned in the context of challenges to the validity of zoning ordinances by landowners who alleged deprivation of due process by virtue of pecuniary loss and it simply omits the interests of those excluded by such ordinances (see Sager, Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent, 21 Stanford L Rev 767; see 11 Urban L Ann 223; 22 Syracuse L Rev 598; Ann 48 ALR3d 1210).
The defendants argue further, however, that if the old precepts are to be relaxed for impecunious plaintiffs, their appropriate replacement is the Federal rule enunciated in Warth v Seldin (422 US 490). In Warth, the Supreme Court made standing contingent upon proof that a contested zoning restriction harms the plaintiffs in a personal way and that relief would confer a tangible benefit such as approval of a specific project in which they have an interest. It denied standing to all of the plaintiffs, consisting of a variety of low and moderate income nonresidents as well as nonresident taxpayers and organizations, but distinguished those cases where low income minority group plaintiffs have been found to have standing to challenge zoning restrictions as applied to particular projects (see, e.g., Park View Hgts. Corp. v City of Black Jack, 467 F2d 1208; Kennedy Park Homes Assn. v City of Lackawanna, 436 F2d 108, cert den 401 US 1010).
The Federal standing law responds "to concerns that are peculiarly federal in nature” (Arlington Hgts. v Metropolitan Housing Corp., 429 US 252, 262, n 8, supra) and is not binding *88 upon State courts. In New Jersey, where standing has been granted to nonproperty owning residents and nonresidents who asserted a violation of their equal protection rights under the State Constitution (Oakwood at Madison v Township of Madison, 72 NJ 481, supra; Southern Burlington County NAACP v Township of Mount Laurel, 67 NJ 151, supra), Warth has been held not binding on a State court entertaining a challenge under the State Constitution because it was predicated on the case or controversy clause in article III of the United States Constitution and upon Federal "prudential limitations” (see Urban League of Essex County v Township of Mahwah, 147 NJ Super 28). States may and do adopt declaratory judgment statutes which do not contain the case or controversy restriction which binds the Federal courts under article III and is reflected in section 2201 et seq. of title 28 of the United States Code (see 26 CJS, Declaratory Judgments, § 24) and State courts dealing with State questions clearly are not bound by the same standing limitations applicable to Federal jurisdictions.
Warth (422 US 490, supra) graphically illustrates that it is the policy of the United States Supreme Court to restrict access to the Federal judicial process under the case and controversy clause and the prudential limitation doctrine. The unmistakable current trend relative to standing in this State, however, is to depart from the harsh requirements of the past which limited access to the judicial forum of those seeking to redress the illegality of legislation and official action (Phelan v City of Buffalo, 54 AD2d 262), particularly where issues of great public significance are involved which are likely to recur (National Organization for Women v State Div. of Human Rights, 34 NY2d 416; Blye v Globe-Wernicke Realty Co., 33 NY2d 15; East Meadow Community Concerts Assoc. v Board of Educ., 18 NY2d 129) or where adherence to the traditional rules would effectively insulate a challenged action from judicial review (Boryszewski v Brydges, 37 NY2d 361; Matter of Burke v Sugarman, 35 NY2d 39; Bloom v Mayor of City of New York, 35 AD2d 92, affd 28 NY2d 952).
Boryszewski v Brydges (supra), involved the standing of a citizen taxpayer to contest the validity of a State statute which provided for legislative and executive retirement plans as well as legislative "lulus.” Abandoning the old "personally aggrieved” rule last restated in St. Clair v Yonkers Raceway (13 NY2d 72, cert den 375 US 970), the court declared (37 *89 NY2d 361, 364, supra) that it was prepared to recognize standing where "the failure to accord such standing would in effect erect an impenetrable barrier to any judicial scrutiny of legislative action.” The broad sweep of the Boryszewski rationale — that it is no longer necessary to establish that plaintiffs suffer special harm as distinguished from that suffered by the public at large — has been somewhat limited by the holding in Matter of Abrams v New York City Tr. Auth. (39 NY2d 990) refusing to apply the new doctrine to discretionary administrative action. With the enactment of article 7-A of the State Finance Law (L 1975, ch 827) the Legislature has codified the Boryszewski holding with reference to disbursement of State funds or State property by providing citizen-taxpayers a statutory remedy against the State which is somewhat similar to that provided by section 51 of the General Municipal Law against municipalities. But even apart from this legislation, Boryszewski teaches that as a matter of general policy in this State "[i]t is unacceptable by any process of continued quarantine to exclude from the judicial process the very persons most likely to invoke its powers” (37 NY2d 361, 364, supra).
The opinion in Berenson v Town of New Castle (38 NY2d 102, supra), did not address the question of standing generally, although it sustained the plaintiff’s standing and contained a cryptic reference to the standing of nonresidents. Berenson did, however, accord recognition to the zoning interests of individuals engaged in the search for housing not only in their own or nearby municipalities but throughout an entire metropolitan region. That recognition vitiates the exclusivity of the former rules of standing in zoning cases because enforcement of the newly recognized rights cannot be deemed dependent upon the availability and good will of property owners willing to intercede for less fortunate persons whose rights have been violated. Basic to the judicial process is the concept that the existence of a statutory or common-law right implies the existence of an appropriate remedy (see 1 CJS, Actions, § 4; Sullivan v Little Hunting Park, 396 US 229; Bolivar v Monnat, 232 App Div 33) and that redress may be sought for every substantial wrong (Battalla v State of New York, 10 NY2d 237). To require those who plead violation of constitutional or statutory rights by virtue of illegal exclusion based upon "racial or economic discriminatory practices” (see Marcus Assoc. v Town of Huntington, 57 AD2d 116, 120) to demonstrate pecuniary damage related to real estate in which they *90 have an interest is absurd to the point of rendering the requirement itself an invidious classification. Similarly irrational is the suggested alternative that such persons be required to establish affiliation with a specific project as a precondition of access to a judicial remedy (see Warth v Seldin, 422 US 490, supra). Such a rule would compel potential plaintiffs to obtain the assistance of beneficient landowners willing to create specific projects for the sole purpose of instituting litigation. There is not always an identity of interest between landowners and those excluded by zoning restrictions (see Williams and Norman, Exclusionary Land Use Controls: The Cast of North-Eastern New Jersey, 22 Syracuse L Rev 475) particularly where the complaint is not that multifamily housing is prohibited in Brookhaven, but only that it is so restricted as to exclude the poor and racial minorities.
Ultimately, the traditional rules also run counter to the strong trend in New York not to exclude from the judicial process those most likely to challenge the validity of legislation or official conduct. The necessity of obtaining the intervention of propertied surrogates to enforce the constitutional or statutory rights of those not possessed of property is an outmoded concept more befitting some past era than the current State of New York jurisprudence. "The tests of 'suable interest’ in modern society cannot rest with archaic rules of property law. If law is to fulfill its role of relieving social tension, there must be recognition of reasonable relationship to a happening” (New York State School Bus Operators Assn. v County of Nassau, 79 Misc 2d 352, 355).
Whether the changes wrought by Berenson and Boryszewski have made New York’s "liberal” law of standing in zoning cases (see Campbell v Barraud, 58 AD2d 570) equivalent to the rule in the American Law Institute’s Model Land Development Code — that any person who claims that a zoning ordinance deprives him of a constitutional or statutory right has standing to challenge it judicially (see American Law Institute Model Land Development Code, § 9-104[5]; see, comment in, Matter of Douglaston Civic Assn. v Galvin, 36 NY2d 1, 7, 8, supra; and Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, 370-375, supra) remains for future adjudication. Nevertheless, it is difficult now to discern how the New York rule differs from the code provision.
The low-income residents Gloria Young, Deborah Clark, *91 John and Kathleen Smith, Margaret Melendez, Mabel Lanzarone, Kyger C. Lohman, Gayle Lohman, Terrence Bostwick, and Ingrid Evans, a low-income resident of Riverhead, fall within the class of persons protected under the Berenson doctrine, and having pleaded the violation of their constitutional and statutory rights as well as injury resulting therefrom, they have the legal capacity to invoke the judicial process on their own behalf. The resident taxpayers Ernest Boyd, Frank Myers, Verlyn Warburton and Carlton Brown lack standing, however, because the Federal claim which they assert was rejected in the Federal courts when made by others (see Warth v Seldin, 422 US 490, supra) and they claim no injury judicially cognizable under existing New York law. Of the potpourri of cases they cite in support of their claim to standing simply because they are taxpayers (see, Matter of Andrews v Nagourney, 41 AD2d 778; Semple v Miller, 38 AD2d 174; Matter of Policemen’s Benevolent Assn. of Westchester County v Board of Trustees of Vil. of Croton-on-Hudson, 21 AD2d 693; Weinberg v Town of Clarkstown, 78 Misc 2d 464; Matter of Marino v Town of Ramapo, 68 Misc 2d 44), only Weinberg involved a zoning issue and there the plaintiff claimed pecuniary injury. Zoning cases traditionally have had their own special standing requirements (see Matter of Haber v Board of Estimate of City of New York, 33 AD2d 571, supra; Brechner v Incorporated Vil. of Lake Success, 25 Misc 2d 920, supra) and although the consequence of the Berenson determination must be substantial relaxation of those rules, a plaintiff is still required to show some injury or deprivation of right. The taxpayer plaintiffs here are seeking to litigate the rights of others and that remains impermissible (see Urowsky v Board of Regents of Univ. of State of N. Y., 38 NY2d 364). Percy Sutton is also merely a concerned bystander who asserts no direct interest in the litigation and as such he, too, is without standing to bring this action (see Sierra Club v Morton, 405 US 727; Matter of McConnell v Coveney, 54 AD2d 769; cf. United States v SCRAP, 412 US 669).
Of the organizational plaintiffs, the Patchogue-Brookhaven Branch of the NAACP is part of a bona fide and nationally-recognized organization dedicated to eliminated discriminatory practices against black persons. In the second and fourth causes of action of the complaint, the claim is made that Brookhaven’s zoning policies violate the Federal and State equal protection clauses as well as particular statutes in *92 illegally discriminating against the minority group persons. When legislation proscribes conduct against a class, the complaining party need not allege and specify injured parties. This plaintiff is of the type which can represent a class with a specific interest in the litigation (see National Organization for Women v State Div. of Human Rights, 34 NY2d 416, supra). The claims of the other two organizations to represent the class they purport to speak for has not been challenged here and, although their standing may be questionable, pretrial dismissal is not warranted on these papers.
The motion to dismiss is denied except as to the named taxpayer plaintiffs and Percy Sutton.